CARAWAY, J.
 

 | iThe claimant refrigeration mechanic in this workers’ compensation action sought benefits from his chicken processing plant employer based upon a claim that he received a lung injury after inhaling ammonia fumes on the job. The Workers’ Compensation Judge (“WCJ”) denied claimant’s demands, finding that he failed
 
 *376
 
 to prove that a work-related accident occurred. For the following reasons, we affirm.
 

 Facts
 

 On August 29, 2005, John Daniel was employed by House of Raeford Farms, Inc. (“House of Raeford”), a chicken processing plant, as a refrigeration mechanic.
 
 [1]
 
 House of Raeford utilized refrigeration in its facilities which involved the use of ammonia for cooling and freezing. In the late evening hours, Daniel was summoned by his supervisor, Eddie Hill, to a location in the plant known as “A Room.” Hill did not inform Daniel that the problem was an ammonia leak in an area outside of A Room. Hill assumed that Daniel had been informed of the fact by other workers.
 

 While en route to A Room, Daniel detected the smell of ammonia (the intensity of which is contested). Believing that Hill might need assistance, Daniel entered A Room without a mask, claiming to take “little short breath[s]” as he looked around. When Daniel was unable to locate Hill, he ran outside of A Room where he encountered “a fog of ammonia” which he allegedly inhaled. Upon his exit of A Room, Daniel saw Hill standing outside near a table, but away from the leak. Daniel claimed that he “fell Dover” the table as he attempted to catch his breath and that Hill asked him if he had gotten his lungs full of gas. Hill denied making that statement.
 

 Daniel testified that after he inhaled the gas, he could not breathe and experienced burning in his eyes, chest and throat. Nevertheless, he was able to obtain a mask and returned to the leak to help another
 
 employee,
 
 Grover Rushing, repair the damage. Daniel completed his shift and worked without work absences for House of Raeford until his termination on November 1, 2005.
 

 Daniel first sought medical treatment from pulmonologist, Dr. Stuart LeBas, on October 10, 2005. Daniel reported to the doctor that he had received exposure to anhydrous ammonia three weeks prior to the visit, even though the ammonia leak had actually occurred six weeks earlier. He reported symptoms of shortness of breath, decreased stamina, decreased appetite, and a bitter taste in his mouth. He did not advise the doctor of any prior pulmonary problems. Dr. LeBas diagnosed Daniel with exposure to ammonia and prescribed medication. Daniel saw Dr. LeBas for two follow-up visits on November 3, 2005, and July 18, 2006. After the final visit, Dr. LeBas diagnosed Daniel with Reactive Airways Dysfunction Syndrome (RADS), an asthma-like condition, which he related to Daniel’s exposure to ammonia. Dr. LeBas never restricted Daniel’s work.
 

 Daniel first filed an employer report of illness with Carolyn Grossman, House of Raeford’s human resources manager, relating to his claimed August exposure on November 7, 2005. House of Raeford conducted an investigation of Daniel’s claim and determined it to be ^unsubstantiated by eyewitnesses. On January 9, 2006, Daniel filed a disputed claim for compensation seeking benefits for the injuries he received as the result of the ammonia leak.
 

 At trial, Daniel’s testimony of the work-related accident was as described above. Hill and Rushing, however, testified to the contrary. Hill testified that he first saw Daniel in an alley located away from the leak, apparently in the location outside A Room which Daniel described. At that time, Daniel did not have a mask on his face. Before Daniel helped to repair the
 
 *377
 
 leak, he obtained a mask from B Room. Hill also obtained a mask. Contrary to Daniel’s testimony, Hill claimed that during the repair of the leak and after the incident, he never saw Daniel in any kind of distress with coughing or shortness of breath. Hill also denied that Daniel ever informed him that he had inhaled ammonia fumes or was experiencing any symptoms. Hill recalled that Daniel completed his shift without incident and, in fact, worked overtime that evening. Hill testified that Daniel also worked the following day. Further disputing Daniel’s testimony, Hill denied ever seeing a cloud of ammonia. He testified that the wind direction, from north to south, would have taken the fumes away from the plant.
 

 The deposition of Grover Rushing was jointly submitted into evidence. Rushing testified that after 10:00 p.m. on August 29, 2005, Hill called him and informed him of an ammonia leak just outside of A Room. When Rushing arrived at A Room, he did not smell ammonia because the “wind was taking it....” He located Hill outside of A Room, near a table. Hill showed Rushing the ammonia leak. Rushing was aware of the wind Indirection because of issues regarding shutting of work lines due to the leak. This decision was made depending on wind direction. Rushing testified that he walked through A Room which contained no smell of ammonia and Hill directed him to the leak outside of A Room. Rushing testified that the leak “wasn’t that bad.” Neither Hill nor Rushing wore a mask as they first observed the leak. Rushing did not see Daniel approach the scene because he was focused on the leak. As he repaired the leak, Rushing wore a mask over his face. As Daniel participated in the repair work, Rushing never heard Daniel wheeze or cough. He testified that the worst thing any of them did was “squinching” their eyes. He never heard Hill ask Daniel if he had gotten his lungs full of ammonia. Daniel never told Rushing that he had swallowed an excessive amount of ammonia or was in any way injured. After the incident he talked with Daniel and another worker, and Rushing testified that it “sounded like [Daniel] was fine then.” Rushing admitted that at the time of the leak there was ammonia in the atmosphere in A Room, but “it wasn’t a cloud of ammonia.” Rushing testified that his job required him to be around ammonia every day.
 

 Some of Daniel’s prior medical records were introduced into evidence by both parties. This evidence showed that he was diagnosed with fatigue and asthma in August 2000 and prescribed oxygen and ne-bulizer masks in April and July 2001.
 

 Two depositions of Dr. Stuart LeBas were also introduced into evidence. He testified that upon Daniel’s first visit with him on October 10, 2005, Daniel reported that after his exposure to ammonia three weeks prior, |fihe experienced swelling of the mouth and tongue, burning of the posterior pharynx and itchy watery eyes. At the time of the visit, Daniel complained of wheezing, shortness of breath and loss of stamina. Daniel reported no prior pulmonary problems to Dr. LeBas. Dr. LeBas prescribed inhalers to Daniel and instructed him to return in a couple of weeks. He did not restrict Daniel’s work. On November 3, 2005, Daniel’s lungs were significantly better. He had less wheezing and his pharynx was clear. Ultimately, Dr. LeBas diagnosed Daniel with RADS, which he related to the ammonia exposure, but issued no opinion on his work abilities. The fact that Daniel completed his work and did not seek medical treatment did not change the opinion of Dr. LeBas. Also, Daniel’s prior medical reports did not convince Dr. LeBas that Daniel suffered from previous pulmonary problems.
 

 
 *378
 
 House of Raeford retained the services of expert pulmonologist, Dr. Robert Jones, to evaluate the case. The deposition of Dr. Jones was submitted into evidence by defendants. Although Dr. Jones never saw Daniel, he reviewed the records of his treating physicians both before and after the exposure incident and the deposition testimony. Dr. Jones explained that RADS is an asthma-like condition that occurs after a bronchial or lung injury caused by a highly irritating material. Dr. Jones testified that he had no reason to doubt that Daniel was exposed to ammonia on August 29, 2005; however, he did not believe that an injury occurred. He stated that ammonia exposure has immediate and very powerful effects on the eyes, nose and throat. Large amounts affect the bronchi and lungs. Dr. Jones testified that Daniel’s failure to seek medical treatment until six | fiWeeks after the incident and his completion of his work shift after the exposure were totally inconsistent with lung or bronchial injury by ammonia. Further, Dr. Jones could not relate to the event any symptoms which subsequently manifested. Dr. Jones testified that it is very difficult to get ammonia down into the lungs; thus, he had never treated a patient who had developed RADS as the result of ammonia exposure. He stated that only individuals who are trapped in ammonia and unable to get away from it suffer lower respiratory or bronchial injury.
 

 After hearing the testimony of the witnesses and considering the deposition and medical record evidence, the WCJ denied Daniel’s claims on the grounds that he had “failed to prove that he sustained an accident or occupational disease during his employment with House of Raeford Farms, Inc., and has failed to prove that he is incapable of earning ninety (90%) of his pre-injury wages.”
 
 [2]
 

 This appeal by Daniel followed the denial of his claims. On appeal, Daniel argues that the WCJ erred in finding that no work-related accident occurred, in failing to address the issue of causation in the final judgment and in finding that he failed to prove that he is incapable of earning 90% or more of his pre-injury wages.
 

 Discussion
 

 It is a well-settled legal principle that the factual findings in workers’ compensation cases are entitled to great weight. Reasonable evaluations of | credibility and reasonable inferences of fact will not be disturbed even though the appellate court may feel that its own evaluations and inferences are as reasonable. The trier of fact’s factual determinations shall not be disturbed in the absence of a showing of manifest error. When the trier of fact’s findings are reasonable in light of the entire record, an appellate court may not reverse a choice between two permissible views of the evidence. Therefore, the appellate standard of review applicable to the findings of a WCJ is the manifest error-clearly wrong test.
 
 Shelton v. Wall,
 
 614 So.2d 828 (La.App. 2d Cir.1993).
 

 In order to recover workers’ compensation benefits, an employee must prove that he suffered “personal injury by accident arising out of and in the course of his employment.” La. R.S. 23:1031(A).
 

 La. R.S. 23:1021 gives the following definitions:
 

 (1) “Accident” means an unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or vio-
 

 
 *379
 
 lently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration.
 

 (7) “Injury” and “personal injuries” include only injuries by violence to the physical structure of the body and such disease or infections as naturally result therefrom. These terms shall in no case be construed to include any other form of disease or derangement, however caused or contracted.
 

 The plaintiff in a workers’ compensation action has the burden of establishing a work-related accident by a preponderance of the evidence.
 
 Buxton v. Sunland Constr.,
 
 34,995 (La.App.2d Cir.8/22/01), 793 So.2d 526. Proof by a preponderance of the evidence is sufficient when the |8evidence, taken as a whole, shows that the fact sought to be proved is more probable than not.
 
 Id.
 

 In determining whether the worker has discharged the burden of proof, the trier of fact should accept as true a witness’ uneontradicted testimony, although the witness is a party, absent circumstances casting suspicion on the reliability of this testimony. An accident at work may be proven by a claimant’s un-contradicted testimony corroborated by the medical evidence. Thus, a worker’s testimony alone may be sufficient to discharge this burden of proof provided that two essential elements are satisfied: (1) no other evidence discredits or casts serious doubt upon the worker’s version of the incident; and (2) the worker’s testimony is corroborated by the circumstances following the alleged incident. Such corroboration, of course, may include medical evidence and the testimony of fellow workers, spouses, or friends.
 
 Bruno v. Harbert Int’l Inc.,
 
 593 So.2d 357 (La.1992);
 
 Buxton, supra.
 
 Delay in giving notice of injury shall not be a bar to recovery if it is shown that the employer has not been prejudiced by such a delay.
 
 Buxton, supra; Holcomb v. Bossier City Police Dep’t,
 
 27,095 (La.App.2d Cir.8/25/95), 660 So.2d 199.
 

 Where objective evidence so contradicts an employee’s testimony, or the testimony is so internally inconsistent or implausible on its face that a reasonable fact finder would discredit the story, a reviewing court may well find manifest error or clear wrongness even in a credibility determination.
 
 Sisk v. Martin Specialty Coatings,
 
 28,592 (La.App.2d Cir.8/21/96), 679 So.2d 569,
 
 writ denied,
 
 96-2328 (La.11/22/96), 683 So.2d 281. If the 13evidence is evenly balanced or shows only some possibility that a work-related event produced the disability or leaves the question open to speculation or conjecture, then the claimant fails to carry the burden of proof.
 
 Buxton, supra; Lubom v. L.J. Earnest, Inc.,
 
 579 So.2d 1174 (La.App. 2d Cir.1991).
 

 The trier of fact’s determinations as to whether the worker’s testimony is credible and whether the worker discharged the burden of proof are factual determinations, not to be disturbed upon review unless clearly wrong.
 
 Bruno, supra.
 

 Daniel’s first assignment of error alleges that the WCJ erred in finding that no work-related accident occurred. Since the accident was not recognized by others on August 29 or reported by Daniel for many weeks, Daniel’s proof of an accident rested on his testimony alone. Given the above burden of proof to establish a work-related accident under those circumstances, we find that the WCJ correctly rejected his claim.
 

 Daniel’s version of the events immediately following his encounter with the
 
 *380
 
 “fog” of ammonia was directly discredited by the other employees who were present. Undoubtedly, all three employees smelled and breathed some ammonia in the area outside A Room before placing on their masks. However, that does not establish an “accident” which produced at the time the objective signs of injury which would be expected from harmful ammonia exposure. Hill and Rushing contradicted Daniel’s assertion that he demonstrated immediate signs of distress by showing troubled breathing and lying over the table. Their testimony reveals that they were unaware 110that an injury to Daniel had occurred, and their description of the ammonia was that it had not obtained any level of severity to cause injury. The WCJ could credit Hill and Rushing’s view of the event over Daniel’s testimony and find that no work-related accident occurred. Additionally, Daniel’s continued work with House of Raeford, his delay in obtaining medical attention, and his prior asthmatic condition are circumstances which tend to discredit his claim of an accident and which corroborate the other employees’ version of the event. Accordingly, the manifest error rule does not allow a court of appeal to overrule the WCJ’s finding of no accident in this case, and workers’ compensation remedies were properly denied.
 

 Conclusion
 

 For the foregoing reasons, the judgment of the Office of Workers’ Compensation is affirmed. Costs of this appeal are assessed to appellant.
 

 AFFIRMED.
 

 [1]
 

 . Daniel had worked for the company since January 2005.
 

 [2]
 

 . In written reasons for judgment rendered on February 6, 2009, the trial court reiterated the previous grounds for judgment. In addition the court concluded that Daniel failed to prove that the inhalation of gaseous chemicals on the date of the leak "caused or contributed to his respiratory problems.”